IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CASSANDRA MCLEAN,                          )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )        1:20CV599
                                           )
KILOLO KIJAKAZI,[1]                        )
Acting Commissioner of Social Security,    )
                                           )
                    Defendant.             )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Cassandra McLean ("Plaintiff") brought this action pursuant to Sections

205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g)

and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social

Security denying her claims for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have

filed cross-motions for judgment, and the administrative record has been certified to the Court

for review.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on April 10, 2017, alleging a

disability onset date of December 1, 2016 in both applications. (Tr. at 14, 196-200.)[2] Her

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue the suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #10].

applications were denied initially (Tr. at 60-91, 124-34) and upon reconsideration (Tr. at 92-121, 137-54). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 155-56.) On April 22, 2019, Plaintiff, along with her attorney, attended the subsequent video hearing, during which both Plaintiff and an impartial vocational expert testified. (Tr. at 14.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 25), and, on June 8, 2020, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-7).

II.    LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270

2

F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.   DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 16.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> bipolar I disorder with mood swings and obesity[.]

(Tr. at 16.) The ALJ found at step three that neither of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 17-19.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform medium work with the following, non-exertional limitations:

> [Plaintiff] is capable of performing all postural functions with the exception of no climbing of ladders, ropes, or scaffolds. [She] retains the capacity to understand, remember and carry out simple instructions and perform simple routine tasks as consistent with unskilled work. In the course of work, [Plaintiff]

5

is to have no in-person contact with the public with the exception that incidental, telephonic and computer contact is not precluded. [Plaintiff] is to have only occasional contact with coworkers and supervisors, occasional being defined as occasional interaction and coordination, but not necessarily proximity to the same.

(Tr. at 19-20.) Based on this determination, the ALJ found at step four of the analysis that Plaintiff could not perform any of her past relevant work. (Tr. at 23.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 24-25.)

Plaintiff now contends that, in assessing her RFC, the ALJ failed to properly (1) account for Plaintiff's moderate limitation in concentration, persistence, or pace in accordance with the Fourth Circuit's decision Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015); (2) assess the consistency of Plaintiff's complaints with the medical and other evidence;[5] and (3) weigh the medical opinion evidence. (Pl.'s Br. [Doc. #14] at 6.) After a thorough review of the record in this case, the Court finds that none of Plaintiff's contentions merit remand.

A. Concentration, Persistence, and Pace

Plaintiff first argues that the ALJ failed to properly address the effects of Plaintiff's moderate limitations in maintaining concentration, persistence, and pace. The ALJ determined at step three of the sequential analysis that Plaintiff has moderate limitations in this functional area. (Tr. at 19.) In Mascio v. Colvin, the Fourth Circuit explained that, where moderate limitations in concentration, persistence and pace are reflected at step three, the ALJ

---

[5] Plaintiff raises two challenges to the ALJ's treatment of her subjective complaints. Because of the overlap between these two contentions, the Court addresses them in tandem.

should address those limitations in assessing the RFC or should explain why the limitations do not affect the claimant's ability to work. The Fourth Circuit specifically held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." Mascio, 780 F.3d at 638 (quotation omitted). This is because "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." Id. The Fourth Circuit further noted that

> [p]erhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. But because the ALJ here gave no explanation, a remand is in order.

Id. (internal citation omitted). However, as previously noted in other cases in this District, the Fourth Circuit's decision in Mascio

> does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision . . . .
>
> An ALJ may account for a claimant's limitation with concentration, persistence, or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.

Tolbert v. Colvin, 1:15CV437, 2016 WL 6956629, at *8 (M.D.N.C. Nov. 28, 2016) (finding that RFC limitations to "simple, routine, repetitive tasks with simple, short instructions, in a job that required making only simple, work-related decisions, involved few workplace changes, and required only frequent contact with supervisors, co-workers, or the public" sufficiently

accounted for a Plaintiff s moderate limitations in concentration, persistence, or pace in light

of the ALJ's explanation throughout the administrative decision) (quoting <u>Jones v. Colvin</u>, No.

7:14CV273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015)); <u>see also</u> <u>Sizemore v.</u>

<u>Berryhill</u>, 878 F.3d 72, 80–81 (4th Cir. 2017) (rejecting the plaintiff's argument under <u>Mascio</u>

where the ALJ relied on the opinion of the state agency psychologist that, notwithstanding

moderate limitations in concentration, persistence, and pace, the plaintiff could sustain

attention sufficiently to perform simple, routine, repetitive tasks with additional limitations);

<u>Shinaberry v. Saul</u>, 952 F.3d 113, 121-22 (4th Cir. 2020) (same, and noting that <u>Mascio</u> "did

not impose a categorical rule that requires an ALJ to always include moderate limitations in

concentration, persistence, or pace as a specific limitation in the RFC").

In the present case, as in <u>Mascio</u>, the ALJ found moderate limitations in concentration,

persistence, or pace at step three of the sequential analysis. (Tr. at 19.) Later in the sequential

analysis, the ALJ formulated a mental RFC in which she found Plaintiff "retains the capacity

to understand, remember and carry out simple instructions and perform simple routine tasks

as consistent with unskilled work." (Tr. at 20.) Plaintiff now argues that, in making this RFC

finding, the ALJ did not fully account for Plaintiff's ability to stay on task in light of her

moderate difficulties with concentration, persistence, or pace. Accordingly, Plaintiff contends

that the ALJ failed to "build an accurate and logical bridge from [that] evidence to his

conclusion" to allow for meaningful review of the SSA's ultimate findings. <u>Woods v. Berryhill</u>,

888 F.3d 686, 694 (4th Cir. 2018) (quoting <u>Monroe v. Colvin</u>, 826 F.3d 176, 189 (4th Cir.

2016)).

Plaintiff acknowledges that an ALJ may account for a claimant's limitation with concentration, persistence, or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion. In this case, however, Plaintiff contends that the ALJ failed to provide a basis for omitting additional limitations. However, the ALJ specifically found that "the disability determination explanations from the State Agency psychological consultants [were] persuasive with regard to [Plaintiff's] moderate limitation with interacting with others and concentrate, persist, or maintain pace" and that the record, "as evidenced by treatment history, treating notes, and mental status examination findings," supported the consultants' opined limitations in these areas. (Tr. at 22.)

With respect to the explanations from the State Agency psychological consultants, at the initial level Darolyn Hilts, Ph.D., opined that Plaintiff was moderately limited in her ability to "maintain attention and concentration for extended periods", and further explained that Plaintiff "would be expected to have difficulty sustaining attention to detailed instructions secondary to her issues with depression . . . and possible PTSD." (Tr. at 70-71.) Nevertheless, Dr. Hilts concluded that Plaintiff "appears to be capable of sustaining attention for shorter periods of time required for the performance of SRRT's [simple, routine, repetitive tasks]." (Tr. at 70-71.) After completing her psychiatric review, Dr. Hilts concluded that "[t]he current evidence in [the] file supports a finding that mental conditions merit restrictions but are not so severe to preclude all work" as further set out in the functional capacity assessment. (Tr. at 67.) Similarly, upon reconsideration, Brett A. Fox, Psy.D., opined as follows:

> [Plaintiff] may have some difficulty at times maintaining attention and concentration for extended periods, working in coordination with, or in proximity to, others, and completing a workday without interruptions from

psychologically based symptoms. However, she should be able to maintain attention and concentration in order to complete simple, routine tasks.

(Tr. at 102.) Dr. Fox further explained:

> [Plaintiff] alleges depression along with bipolar disorder. [Plaintiff] is in treatment for mental health issues including Bipolar Disorder, PTSD, Panic Disorder, and ADHD. [Plaintiff] is in treatment with ongoing symptoms that are noted to be mild to moderate in nature per recent progress note.
>
> At this time, [Plaintiff] should be stable enough to complete simple tasks in a less demanding work setting provided they fall within her physical abilities.

(Tr. at 103.) In short, both State agency consultants determined that, despite her moderate limitations in concentration, persistence, and pace, Plaintiff retained the ability to work in a less demanding position involving only simple, routine tasks. The ALJ expressly adopted these findings, provided reasons for doing so, and included nearly identical limitations in Plaintiff's RFC assessment. (Tr. at 20, 22.) In addition, the ALJ also specifically noted with regard to Plaintiff's limitations in concentration, persistence, and pace, that she "often reported adequate symptoms control from psychiatric medications" and she "reported watching television and reading for pleasure, which requires some concentration and persistence" and "[s]he is able to drive and grocery shop, which requires some concentration and persistence." (Tr. at 19.) In assessing the RFC, the ALJ also considered the medical evidence at length, and specifically concluded that Plaintiff's functional limitations could be accommodated "by limiting interaction with others in the workplace and unskilled work." (Tr. at 22.) In reaching this conclusion, the ALJ relied on her own analysis of the evidence and the opinions of the state agency psychological consultants, as discussed above. Thus, the ALJ considered and discussed the record and built a logical bridge between the evidence in the record and the RFC. In these circumstances, the Court finds no basis for reversal under Mascio.

10

B. Subjective Complaints

Plaintiff next argues that ALJ erred in two respects when evaluating her subjective complaints. First, Plaintiff contends that the ALJ determined the RFC before assessing the consistency of Plaintiff's complaints, in contradiction to the Fourth Circuit's holding in Mascio, 780 F.3d at 639. (Pl.'s Br. at 13-16.) Second, Plaintiff asserts that symptom evaluation itself was flawed, as the ALJ failed to provide "specific rationale for finding [Plaintiff's] statements inconsistent with the . . . evidence," and instead relied on "vague references in the medical records." (Pl.'s Br. at 18-21.)

With regard to Plaintiff's Mascio challenge, the Court finds no basis for remand. Notably, in Mascio, the ALJ applied boilerplate language which stated, in pertinent part, that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." 780 F.3d at 639 (citation omitted). The Fourth Circuit held that "this boilerplate gets things backwards by implying that ability to work is determined first and is then used to determine the claimant's credibility." Id. (internal quotation omitted). The Fourth Circuit held that the ALJ "should have compared Mascio's alleged functional limitations from pain to the other evidence in the record, not to Mascio's residual functional capacity." Id. In the present case, however, the ALJ found that Plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. at 22.) Unlike the language in Mascio, this boilerplate does

11

not imply "that ability to work [was] determined first and [was] then used to determine the claimant's credibility." 780 F.3d at 639 (quotation omitted).

Moreover, Mascio further explains that, even where an ALJ makes a "backwards" credibility determination, "[t]he ALJ's error would be harmless if [she] properly analyzed credibility elsewhere." Id. In that case, the ALJ simply failed to perform such an analysis. In contrast, the ALJ in the present case recounted Plaintiff's testimony and related her reasons for discounting the severity and limiting effects of Plaintiff's mental impairment based on the record as a whole. (Tr. at 20-23.) As reflected in the ALJ's decision, Plaintiff testified that "[d]aily symptoms that prevent her from working include fatigue, depression, anxiety, difficulty being around people, paranoia, and fear that something bad will happen to her." (Tr. at 20.) Plaintiff further testified that she has experienced improvement with medications and that she has not had a psychiatric admission since 1996, when she attempted suicide. (Tr. at 20.) The ALJ ultimately concluded that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms "are not entirely supported by the record." (Tr. at 22.) The ALJ then explained the rationale for this finding as follows:

> [Plaintiff] has undergone conservative treatment for her mental health symptoms including medication management and some therapy. She often reported adequate response with medications and improvement of symptomatology. She did not frequently complain of adverse side effects from medications. Despite medications, she did have some ongoing symptoms; however, her psychiatrist indicated that she remained with good functioning despite current symptoms. It is noted that [Plaintiff] endorsed significant symptoms at times, including suicidal thoughts, however she did not require[] any inpatient mental health treatment and no voluntary or involuntary psychiatric hospitalizations. Her mental status examinations and reported symptoms showed improvement with treatment and medication compliance. Overall, the record does not support her allegations of disabling mental symptoms or functional limitations to the extent purported. The [RFC] assessment more than accommodates [Plaintiff's] supported allegations by

limiting interaction with others in the workplace and [limiting her to] unskilled work.

(Tr. at 22.) Plaintiff now asserts that the above explanation fails to provide "specific rationale" for discounting her statements. Instead, she argues, the ALJ relied on "vague references in the medical records in order to conclude that" Plaintiff's subjective statements were not entirely consistent with the evidence. (Pl.'s Br. at 18.)

Plaintiff is correct that, under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p");[6] see also 20 C.F.R. § 404.1529. Moreover, in Arakas v. Comm'r of Soc. Sec., 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit recently clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic

---

[6] SSR 16-3p was initially published on March 16, 2016, and is available at 2016 WL 1119029. The Ruling was republished on October 25, 2017, 2017 WL 5180304, to clarify the effective date of the rule.

techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

983 F.3d at 95–96.

In the present case, contrary to Plaintiff's assertions, the ALJ provided more than conclusory statements discounting Plaintiff's testimony. As instructed by the regulations, the ALJ considered the entire case record and explained her reasons for deviating from Plaintiff's statements regarding the impact of her symptoms on her ability to work. This explanation was provided, not only in the paragraph quoted above, but throughout the ALJ's RFC discussion and her discussion at step three of the sequential analysis. For example, the ALJ noted that Plaintiff had "undergone conservative treatment for her mental health symptoms including medication management and some therapy," and further explained this finding by specifying that "she did not require[] any inpatient mental health treatment and no voluntary or involuntary psychiatric hospitalizations." (Tr. at 22.) In addition, the ALJ found that "she often reported adequate response with medications and improvement of symptomatology" and in support of this finding, the ALJ recounted Plaintiff's psychiatric treatment notes at length. In particular, the ALJ's discussion of this evidence reflects multiple medication changes between early 2017, when Plaintiff began treatment, and the end of that year. During that time, Plaintiff's doctors adjusted both the type of medication and the dosages numerous times in response to Plaintiff's feedback regarding the effectiveness of the various prescriptions and their side effects. (Tr. at 21-22.) However, treatment records from 2018 forward increasingly characterize Plaintiff's symptoms as "stable" (Tr. at 21, 893) or "well controlled on her current medication regimen." (Tr. at 21, 524, 534, 824, 826, 877). Although

14

Plaintiff's providers continued to tweak the dosages of her medications during this period, and addressed a period in mid-2018 when she ran out of her medications for three weeks (Tr. at 890), the record indicates that Plaintiff's functioning improved despite her remaining symptoms, which included moderate depression with occasional auditory hallucinations. (Tr. at 21, 874, 877, 880, 1213-14.) The most recent mental health treatment records reflect that in October 2018 her CGI rating had improved to 4/7, reflecting "moderately ill" (Tr. at 880-81), two months later in December 2018 she remained at that level with only moderate symptoms by her subjective report (Tr. at 877), and the next month in January 2019 she remained at the same level with only mild and moderate symptoms by her subjective report (Tr. at 874). The January 2019 mental status examination noted that her depression was "moderate, without functional impairment from symptoms" and her mania was "moderate, without functional impairment from symptoms." (Tr. at 872.) Her thought process was "coherent with slow production" with unimpaired judgment. (Tr. at 872-73.) Finally, two months later in March 2019, she had improved to a severity rating of 3/7 reflecting only "mildly ill," and the medical record of "Updates to Psychiatric History since Last Visit" reflect that "[s]he remains with good functioning despite current symptoms." (Tr. at 1213.) By her subjective reports, her symptoms were generally mild and low-moderate (Tr. at 1213-14), and on mental status examination her depression was "[m]oderate, without functional impairment from symptoms," and her mania was "mild," with moderate slowing and unimpaired judgment (Tr. at 1214-15.) The treatment plan reflects she was "stable at this time on current medication regimen." (Tr. at 1215.)

The ALJ discussed these records, and they support the ALJ's conclusion that Plaintiff's "mental status examinations and reported symptoms showed improvement with treatment and medication compliance." (Tr. at 22.) The ALJ also discussed specific details from the most recent mental health treatment record from March 2019, supporting the ALJ's finding that "her psychiatrist indicated that she remained with good functioning despite current symptoms" (Tr. at 21-22). By relying on treatment records demonstrating improvement, the ALJ did not suggest that Plaintiff's treatment rendered her free from mental limitations. Rather, the ALJ acknowledged that Plaintiff continued to suffer from "fatigue, depression, anxiety, difficulty being around people, paranoia, and fear that something bad will happen to her" throughout the time period at issue. (Tr. at 20.) However, the ALJ ultimately concluded, based on the record as a whole, that the intensity, persistence, and functionally-limiting effects of Plaintiff's mental impairments did not preclude all work activity as Plaintiff contends.

Notably, as explained with regard to Plaintiff's previous contention, the ALJ also expressly relied on the opinions of the State agency psychological consultants in assessing the limiting effects of Plaintiff's mental limitations. (See Tr. at 22.) In doing so, the ALJ declined to adopt the consultants' finding that Plaintiff was moderately limited in adapting or managing herself or the finding of Dr. Fox at the reconsideration level that Plaintiff was moderately limited in understanding, remembering, or applying information. (Tr. at 22, 66, 98.) The ALJ explained that these finding "are not persuasive or consistent with the record." (Tr. at 22.) In terms of understanding, remembering, or applying information, the ALJ further explained that

> The medical evidence or record, including mental status reports, generally shows no serious deficits in long-term memory, short-term memory, insight, and judgment. [Plaintiff] was able to give a good history of her medical and mental health history to treating and examining practitioners. [She] has reported

16

watching television and reading for pleasure, which requires some memory and understanding. [Plaintiff] is able to perform activities of daily living, such as driving and grocery shopping, which require a basic level of understanding, remembering, and applying information.

(Tr. at 18.) Similarly, the ALJ found only mild limitations in adapting or managing oneself, noting that

The medical evidence of record shows [Plaintiff] did not usually complain about serious problems with adaptation and managing herself. Observations of treating and examining practitioners generally show [Plaintiff] had no deficiencies in hygiene and wore appropriate attire. There is no evidence [Plaintiff] had serious problems being aware of normal hazards and taking appropriate precautions. [She] had no problems with independently making plans and setting goals. However, [Plaintiff] testified that she did not handle her own activities of daily living[] without assistance from others.

(Tr. at 19.) In light of these findings, the ALJ formulated an RFC assessment consistent with the consultants' ultimate conclusions in terms of social and concentration limitations. (Tr. at 20, 68, 103.) Significantly, both consultants found that, despite her impairments, Plaintiff remained capable of performing simple, routine tasks and interacting appropriately with coworkers and supervisors. (Tr. at 67-68, 71-72, 103.) Dr. Fox specifically recounted at the reconsideration level that Plaintiff "is in treatment [for bipolar disorder, PTSD, panic disorder, and ADHD] with ongoing symptoms that are noted to be mild to moderate in nature per recent progress note[s]." (Tr. at 103.) He posited that, as of his January 2018 opinion, Plaintiff "should be stable enough to complete simple tasks in a less demanding work setting provided they fall within her physical abilities." (Tr. at 103.) These findings are again consistent with the ALJ's findings of improved functioning, which continued to improve further into 2019 as set out by the ALJ in reviewing the medical records, and would support the ALJ's ultimate RFC assessment. In sum, a thorough reading of the administrative decision reveals that, in

17

accordance with the regulations, the ALJ articulated specific reasons supporting her evaluation of Plaintiff's symptoms.

C. Opinion Evidence

Finally, Plaintiff contends that the ALJ failed to sufficiently consider the medical opinion of Physician's Assistant Chelle Stinson Jeffery in accordance with the regulations. Under the applicable regulations for claims filed on or after March 27, 2017,[7]

> [The ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. . . . .

> (1) <u>Supportability.</u> The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

> (2) <u>Consistency.</u> The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

> (3) <u>Relationship with the claimant</u> . . . [which includes]: (i) Length of the treatment relationship. . . (ii) Frequency of examinations. . . . (iii) Purpose of the treatment relationship. . . . (iv) Extent of the treatment relationship. . . [and] (v) Examining relationship. . . .

> (4) <u>Specialization</u>. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative

---

[7] In 2017, the Social Security Administration revised its regulations governing the analysis of opinion evidence. Under the new regulations, for claims filed on or after March 27, 2017, decision-makers must consider the persuasiveness of each opinion as set out above.

medical finding of a medical source who is not a specialist in the relevant area of specialty.

(5) <u>Other factors</u>. . . . This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. . . .

20 C.F.R. § 404.1520c(a) and (c). Thus, in weighing the opinion evidence under the revised regulations, all medical source opinions, including those from both treating and non-treating physicians, must be considered using the factors listed in paragraphs (c)(1) through (c)(5) of § 404.1520c. The regulations specifically provide that the most important factors when evaluating the persuasiveness of an opinion are the first two: supportability and consistency. 20 C.F.R. § 404.1520c(a), 404.1520c(c)(1)-(c)(2)

In this case, on March 28, 2019, Ms. Jeffery, a physicians' assistant at Plaintiff's primary care provider, completed a five page "Physical Medical Source Statement," prepared by Plaintiff's attorney. (Tr. at 1056-1060.) In the statement, Ms. Jeffery listed Plaintiff's diagnoses as fibromyalgia, irritable bowel syndrome, and bipolar disorder, but she specifically noted that Plaintiff's mental impairment is "managed by psychiatry." (Tr. at 1056.) Ms. Jeffery described Plaintiff's physical impairments as causing "constant pain," which is "aggravated by movement, mood[,] and often unidentified triggers." (Tr. at 1056.) She then went on to indicate that Plaintiff's pain would significantly, and in some cases severely, limit her ability to perform nearly all basic work activities, including standing, walking, sitting, and the performance of all postural activities. (Tr. 1057-59.) Moreover, she indicated that Plaintiff would need one or two unscheduled, 15-30 minute breaks each workday, would be off task

19

10% of a typical workday, was incapable of even "low stress" work, and would miss more than four workdays per month as a result of her impairments or treatment. (Tr. at 1057-60.)

In considering this opinion evidence, the Court notes as an initial matter that Ms. Jeffery's opinion relates primarily to Plaintiff's physical impairments, specifically fibromyalgia and irritable bowel disease. However, Plaintiff does not raise any appeal or challenge in this case regarding the ALJ's determination as to her physical impairments. At step two of the sequential analysis, the ALJ specifically found that neither Plaintiff's fibromyalgia nor her irritable bowel disease constituted severe impairments, let alone rendered her disabled. (Tr. at 17.) The ALJ noted that, although she considered fibromyalgia a medically determinable impairment, "[t]here are no significant objective medical findings or identification of limitations in the record" relating to fibromyalgia. (Tr. at 17.) She further recounted that "[t]here are no physical examinations in exhibits 9F, 11F, and 13F that reveal trigger points. The representative also agreed that his review of the record showed no tender or trigger points on examination. Accordingly, this medically determinable impairment produces no more than minimal limitations upon [Plaintiff's] ability to perform work-related activities and is non-severe." (Tr. at 17.) With respect to Plaintiff's alleged irritable bowel syndrome, the ALJ found even less support, concluding that "there are no medical signs or laboratory findings established by medically acceptable clinical or laboratory diagnostic techniques, showing the existence of [this] impairment . . . , showing that [this impairment] result[s] in anatomical, physiological[,] or psychological abnormalities[,] or showing that [this impairment] could reasonably be expected to produce the pain or other symptoms alleged." (Tr. at 17.) These findings are not challenged by Plaintiff, and these findings would clearly support the ALJ's

20

later determination that Ms. Jeffery's assertion of disabling symptoms from fibromyalgia and irritable bowel syndrome were not persuasive. (Tr. at 22.) In any event, given that Plaintiff has not raised any appeal or challenge regarding her physical impairments, there is no basis to further consider any issues regarding Ms. Jeffery's opinion as to Plaintiff's physical impairments.

With respect to Plaintiff's mental impairment, Plaintiff contends that the ALJ failed to sufficiently consider Ms. Jeffery's opinion and just summarily concluded that the opinion was "not wholly persuasive" because it was not "consistent with the record" (Tr. at 22). Plaintiff contends that the ALJ failed to cite any particular inconsistencies and that the ALJ's analysis was not sufficiently detailed to permit review. However, the ALJ's decision here, read as a whole, sets out multiple reasons for concluding that Ms. Jeffery's opinion was not persuasive. For example, with respect to the type of provider, the ALJ recognized Ms. Jeffery as Plaintiff's primary care provider (Tr. at 22), and the ALJ in contrast noted that the State Agency psychological consultants Dr. Hilts and Dr. Fox were "psychological specialists" and their opinions regarding Plaintiff's mental health impairments were "within the area of expertise." (Tr. at 22.) As discussed in detail above, the State agency psychological consultants considered Plaintiff's treatment records through 2018, and concluded that Plaintiff could work with some limitations in light of the information set out in the records. The ALJ found these opinions persuasive as specified. (Tr. at 20, 22.)

Moreover, to the extent that Ms. Jeffery's opinion is based on limitations from Plaintiff's bipolar disorder, Ms. Jeffery's opinion itself specifically notes that Plaintiff's mental health was managed by psychiatry, rather than primary care providers. (Tr. at 1056.) With

21

respect to Plaintiff's psychiatric treatment, the ALJ chronicled the evidence of Plaintiff's mental health treatment with Plaintiff's treating psychiatrist Dr. Aiken and his staff. (Tr. at 17, 19-22.) That evidence is discussed at length above. Of particular note, the ALJ discussed in detail Plaintiff's psychiatric treatment record from March 5, 2019 (Tr. at 21, 1213-14), which was the most recent psychiatric treatment record and is the only treatment note from around the time of Ms. Jeffery's March 2019 opinion. As noted by the ALJ, that March 2019 mental health treatment record reflects that Plaintiff had good functioning despite her current symptoms and that she was stable on the current medication regimen as set out in greater detail above. (Tr. at 21, 1213-14.)

Moreover, Ms. Jeffery's opinions are inconsistent with her own treatment records. As noted by the ALJ, "[p]rimary care treating notes dated June 26, 2018 indicate that [Plaintiff's] bipolar disorder is well controlled on her current treatment regimen" and "[m]ood, affect, and behavior were normal." (Tr. at 21, 826.)    Indeed, in the 18 months prior to Ms. Jeffery's opinion, Ms. Jeffery's own treatment notes reflect four visits in total: a visit on February 27, 2018 for cough, noting that Plaintiff's bipolar disorder was managed by psychiatry and that she "is very pleased with recent changes to her psychiatric medication regimen" with an examination reflecting normal mood, affect, speech and behavior (Tr. at 1152-54); a visit on June 26, 2018 for fibromyalgia, with a notation that her bipolar disorder is "well controlled" and she "feels good on her current medication" and will "follow-up with psychiatry" with an examination reflecting normal mood, affect, speech, and behavior (Tr. at 1161-62, 1164, 1167); a visit on October 16, 2018 for a gynecological exam, with a notation that her bipolar disorder is "stable and managed primarily by psychiatry" with an examination reflecting normal mood,

22

affect, speech and behavior (Tr. at 1174-76); and a visit on January 15, 2019 for fibromyalgia, with a notation that she "[s]ees Laura at the Mood Treatment Center" and with an examination reflecting normal mood, affect, speech, and behavior (Tr. at 1186-88). Thus, as noted by the ALJ, these primary care treating notes reflect that her bipolar disorder is well controlled on her current medication and her mood, affect, and behavior were normal. (Tr. at 21.) Read as a whole, the basis of the ALJ's determination is clear, and substantial evidence supports the ALJ's determination that Ms. Jeffery's opinion is not consistent with the record.

Plaintiff cites the Court's decision in Brown v. Saul, No. 1:18CV658, 2020 WL 887974 (M.D.N.C. Feb. 24, 2020), but in Brown, "the ALJ gave [the provider's] opinion 'partial weight,' but failed to describe which limitations he accepted, which he did not, and why he did so," and in that case the Court was "left to guess as to what portions of [the provider's] treatment records the ALJ found inconsistent with [that provider's] opinion." 2020 WL 887974, at *6. In contrast, in the present case, the ALJ did not accept any of Ms. Jeffery's opinions. (Tr. at 19-22, 1056-60.) Accordingly, the Court is not "left to guess" which limitations the ALJ accepted. In addition, as discussed above, the ALJ's discussion of the record sets out the evidence that conflicts with Ms. Jeffery's opinions, including the State Agency psychological consultants' opinions, the mental health treatment records, and Ms. Jeffery's own treatment records. Overall, the ALJ provided a sufficient basis, susceptible to judicial review, for her finding that the record did not support the severely restrictive limitations opined by Ms. Jeffery.

Plaintiff also notes in particular that Ms. Jeffery opined that Plaintiff would be off task – that is, that her symptoms would interfere with her attention and concentration as to even

23

simple work tasks – for 10% of a typical work day. (Tr. at 1060.) However, the ALJ did not

find Ms. Jeffery's opinion persuasive and did not adopt this limitation. With respect to this

aspect of Ms. Jeffery's opinion, the ALJ further noted that "even if [Plaintiff] were to be off

task mentally 10% in an eight-hour workday, she would still be able to work as the vocational

expert testified that the most time off-task that would preclude all work is greater than 15%

off-task in an eight-hour workday." (Tr. at 22, 56.) On this point, Plaintiff contends that

"while the VE says that 15 percent off task is 'excessive,' the VE does not say that everything

below 15 percent is not excessive." (Pl. Br. at 18.) However, the Vocational Expert specifically

responded regarding a hypothetical individual as follows:

> Q.     . . . Hypothetical two, if an individual is off task mentally for 20 percent
> of an eight-hour workday, any jobs?
> A.     No, Judge. According to the studies by the U.S. Department of Labor,
> and my 25 to 35 years of working with my career and doing job analysis, 15
> percent is the maximum tolerated off task. And that is excessive. That
> individual, most especially in unskilled work, would not be able to maintain a
> job.

(Tr. at 56.) This testimony confirms that being off task 20% of the time would be excessive

and that such an individual would not be able to maintain an unskilled job, and that the

maximum tolerated off task is 15%, at least according to the VE testifying in this case. This

is consistent with the ALJ's determination that even if she accepted Ms. Jeffery's opinion

(which she did not), being off task 10% of the day would still be below the maximum tolerated

according to the VE, and would not be disabling. Nothing about this observation requires

remand here.

In sum, the ALJ sufficiently explained her decision and substantial evidence supports

the ALJ's determination. Plaintiff essentially asks the Court to reconsider and re-weigh the

evidence presented. However, it is not the function of this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are supported by substantial evidence. As noted above, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]" Hancock, 667 F.3d at 472 (quotation omitted). Thus, the issue before the Court is not whether a different fact-finder could have drawn a different conclusion, or even "whether [Plaintiff] is disabled," but rather, "whether the ALJ's finding that [Plaintiff] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, the ALJ reviewed the evidence, explained her decision, explained the reasons for her determination, and that determination is supported by substantial evidence in the record. Plaintiff has not identified any errors that require remand, and Plaintiff's Motion for Judgment on the Pleadings should therefore be denied.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment on the Pleadings [Doc. #13] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #15] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 12th day of August, 2021.

/s/ Joi Elizabeth Peake
United States Magistrate Judge